RECEIVED

NOV 25 2019

CLERK, U.S. DISTRICT COURT
ST. PAUL, MINNESOTA

19 sc 2973 PJS/ECW

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA, *ex rel.*
[UNDER SEAL],

      Plaintiff and Relator,

v.

[UNDER SEAL],

      Defendants.

**FALSE CLAIMS ACT COMPLAINT
AND DEMAND FOR JURY TRIAL**

<u>FILED UNDER SEAL PURSUANT TO</u>
<u>31 U.S.C. § 3730(b)(2)</u>

**DO NOT ENTER ON PACER**

**DO NOT PUT IN PRESS BOX**

**[FILED IN CAMERA AND UNDER SEAL]**

SCANNED   CK

NOV 25 2019

U.S. DISTRICT COURT ST. PAUL

19sc 2973 PJS/Ecw

**RECEIVED**

NOV 25 2019

CLERK, U.S. DISTRICT COURT
ST. PAUL, MINNESOTA

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| UNITED STATES *ex rel.* Jennifer Jones and Pamela Joffe;<br><br>and<br><br>JENNIFER JONES, individually,<br><br>Plaintiffs,<br><br>vs.<br><br>INTREPID USA HEALTHCARE, INC.,<br><br>Defendant. | Case No. _____<br><br>**FILED UINDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>**DO NOT PLACE IN PRESS BOX**<br>**DO NOT ENTER ON PACER**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

1.     Plaintiffs/Relators Jennifer Jones and Pamela Joffe brings this action on behalf of Plaintiff United States under the Federal False Claims Act, 31 U.S.C. §§ 3729 – 3733 (the "False Claims Act" or "FCA") against Defendant Intrepid USA Healthcare, Inc. ("Intrepid") to recover, among other things, damages and penalties owed as a result of a systemic fraud that Intrepid has perpetrated against the government.  Plaintiff Jones further brings this action individually to recover against Intrepid for wrongfully terminating her for reporting and objecting to Intrepid's fraudulent conduct.

2.     In summary, Intrepid, a hospice provider, routinely enrolled and retained patients in hospice who were not terminally ill and/or who did not have required certifications and documentation required by Medicare as a condition of reimbursement.  To increase admissions, Intrepid instituted a bonus program that paid sales recruiters and clinical staff substantial bonuses based not only patient admissions and retention, but on a patient's terminal disease diagnoses

and anticipated length of stay, paying special incentives to those patient admissions based on diseases more likely to be chronic and thus result in a longer patient stay.

3.      As a result, Intrepid admitted and retained patients who were not terminally ill, resulting in patient length of stays that eclipsed national averages.  For example, as of August 2019, 42 percent of Intrepid's patients at its site in Roseville, Minnesota had hospice stays of greater than 180 days (the life expectancy necessary to qualify for hospice) compared to a national average of 14 percent, with 18 percent (nearly one in five) having a length of stay in excess of one year.

4.      Plaintiffs are registered nurses and former Intrepid employees.  They reported to senior management their concerns about patients being enrolled or retained who were not terminally ill and about files missing certifications and documents required by Medicare as a condition of reimbursement.  Rather than address and correct the problem, Intrepid's Chief Compliance Officer ordered that the patients remain in hospice, and personally closed out over 50 audits of patient files that had incurable missing document or certification issues.

5.      Further, in retaliation for objecting to the misconduct, Intrepid abruptly terminated Plaintiff Jones, telling her, falsely, that her position had been eliminated.  Within two days after her termination, however, Intrepid posted a job opening for Plaintiff Jones's exact position to fill her vacancy, thus confirming that Intrepid's stated reason for Plaintiff Jones's termination was a sham to attempt to conceal the retaliatory nature of the action.

6.      Plaintiffs now seek to recover on behalf of the United States damages and penalties for the millions of dollars in false claims that the United States paid to Intrepid, and Plaintiff Jones seeks damages for her wrongful and retaliatory termination.

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction over the FCA claims under 31 U.S.C. § 3732(a), and 28 U.S.C. §§ 1331 and 1345. This Court has subject matter jurisdiction over Plaintiff Jones's claim under the FCA for retaliatory conduct and wrongful termination under 31 U.S.C. § 3730(h) and 28 U.S.C. § 1331. It further has subject matter jurisdiction over her common law wrongful termination claim under 28 U.S.C. § 1367 because said claim is so related to the claims in this action over which the Court has original jurisdiction that it forms part of the same case or controversy under Article III of the United States Constitution.

8.    This Court has personal jurisdiction over Intrepid because section 3732(a) of the FCA permits worldwide service of process, and Intrepid is a United States domiciled company doing business throughout several states. Venue is appropriate in this District under section 3732(a) of the FCA because Intrepid transacts business in this District, can be found in this District, and because several of the illegal acts proscribed by the FCA occurred in this District.

## PARTIES

9.    Intrepid is a home health and hospice company headquartered in Carrollton, Texas. One of their three lines of service is hospice care. Intrepid runs its hospice care through multiple sites, including sites located in Roseville, Minnesota; Indianapolis, Indiana; and Virginia Beach, Virginia. Intrepid is owned by Patriarch Partners LLC, which is owned and operated by Lynn Tilton, a self-proclaimed entrepreneur and billionaire. Patriarch Partners is a private equity firm, with investments in more than 75 companies across multiple industry sectors, including healthcare.

10.     Plaintiff Jones is a registered nurse domiciled in Fort Wayne, Indiana.  Plaintiff Jones worked for Intrepid from May 2016 to September 2019.  For the majority of her time at Intrepid she was a corporate travel nurse, which entailed travelling to Intrepid's various sites, including its site in Roseville, Minnesota.  Her job duties included planning, managing, and providing care for Intrepid's patients, as well as maintaining charts of assigned patients to ensure compliance with regulatory billing requirements.  Her job duties included completing quality assurance reviews, as well as auditing patient files to ensure compliance with Medicare laws and policies.

11.     Plaintiff Joffe is a registered nurse with a masters of business administration and is domiciled in Tampa, Florida.  Plaintiff Joffe worked for Intrepid as the Director of Quality Assurance and Performance Improvement ("QAPI") and New Business Development.  Her job duties included overseeing Intrepid's quality assurance policies and procedures, including patient audits to ensure compliance with Medicare laws and policies.

## GENERAL ALLEGATIONS

**A.     Medicare's Hospice Benefit and Required Documentation Necessary for Reimbursement.**

12.     Hospice care is a benefit under Medicare Part A's hospital insurance program.  To be eligible to elect hospice care under Medicare, an individual must be entitled to Part A of Medicare and be certified as terminally ill.  An individual is considered terminally ill if the medical prognosis is that the individual's life expectancy is six months or less if the illness runs its normal course.

13.     An individual, or his or her authorized representative, must elect hospice care to receive it.  The hospice benefit is segmented into periods, each of which requires certification or

recertification that the patient is terminally ill. The first benefit period is for 90 days, followed by an additional 90-day period, followed by an unlimited number of 60-day periods.

14.     Unnecessarily admitting patients into hospice is a very serious public health and welfare issue. First, it is dangerous, as it can cause patients who are not terminally ill to stop seeking treatments for recovery. Second, it can also take a profound psychological toll on the patient and family members, who have prepared themselves for their own death or the loss of a loved one, only to be continually strung along while hospice providers reap substantial Medicare reimbursements at the cost of taxpayers.

15.     For these reasons, Medicare hospice laws, regulations, and policies have strict documentation, certification, and other requirements governing hospice election and certification of terminal illness. The laws, regulations, and polices expressly make compliance with these requirements a condition of payment.

16.     One requirement is an election statement, where the Medicare beneficiary elects hospice treatment. 42 C.F.R. § 418.24(b); Medicare Benefit Policy Manual ("Medicare Manual"), chpt. 9, § 20.2.1. The election statement must include the following information:

- The identity of the designated hospice and attending physician furnishing the patient care; the patient or representative must acknowledge the identified attending physician was their choice;

- The patient's or representative's acknowledgement that the patient understands that he or she is to receive end of life care rather than curative hospice services;

- The patient's or representative's acknowledgement that the patient waives certain Medicare services by electing hospice benefits;

- The effective election date, which may be the first day of hospice care or a later date, but not earlier than the statement of election; and

- The patient's or representative's signature.

*Id.*

17.     The hospice must comply with the election statement requirements to be eligible for payment. *See* 42 C.F.R. § 418.24(a)(4) (providing that a timely filing of a notice of election is a condition precedent for reimbursement) and 42 C.F.R. § 418.24(b) (holding that the required election statement "must" contain the above-described information); *see also* Medicare Manual, chpt. 9, §§ 20.2.1 and 20.2.1.1.

18.     Another set of requirements relate to the certification of terminal illness.  For the first 90-day coverage period, the hospice must obtain a written certification statement of the terminal illness from (1) the hospice's medical director or physician member of the hospice interdisciplinary group, and (2) the patient's attending physician if the patient has an attending physician. 42 U.S.C. § 1395f(a)(7)(A)(i); 42 C.F.R. § 4188.22(c)(1); Medicare Manual, chpt. 9, § 20.1.  For each subsequent benefit period, the recertification statements are required only from the hospice's medical director or physician member of the hospice interdisciplinary group.  42 U.S.C. § 1395f(a)(7)(A)(ii); 42 C.F.R. § 4188.22(c)(2); Medicare Manual, chpt. 9, § 20.1.

19.     The certification must be in writing.  42 U.S.C. § 1395f(a)(7)(A)(i); 42 C.F.R. § 4188.22(c)(1); Medicare Manual, chpt. 9, § 20.1.  If the hospice cannot obtain a written certification within two calendar days after hospice admission, it must obtain an oral certification within two calendar days.  42 C.F.R. § 418.22(a)(3)(i); Medicare Manual, chpt. 9, § 20.1.  The hospice must obtain the written certification before it submits a claim for payment. *Id.*  Hospice staff must document oral certifications in the medical record as soon as they receive one. *Id.*  Written certifications must be filed in the medical record. *Id.*

20.     The content of each certification must conform with the following requirements:

- The certification must specify that the individual's prognosis is for a life expectancy of six months or less if the terminal illness runs its normal course;

- The certification must be accompanied by specific clinical findings and other documentation supporting a life expectancy of six months or less;

- The physician must include a brief narrative of the clinical findings supporting a life expectancy of six months or less, with a signed attestation by the physician immediately following the narrative;

- In cases where a face-to-face encounter is required, the physician or nurse practitioner must attest that such encounter occurred and the date upon which it occurred (face-to-face encounters are required for all patients prior to the beginning of the patient's third benefit period);

- The certification must be signed by the physician or physicians and include the benefit dates to which the certification or recertification applies.

*See* 42 C.F.R. § 418.22(b); Medicare Manual, chpt. 9, § 20.1.

21.     Medicare reimbursement is specifically conditioned on compliance with these certification requirements. 42 U.S.C. § 1395f(a)(7); 42 C.F.R. §§ 418.20(b) and 418.22(b); Medicare Manual, chpt. 9, § 20.1.

22.     Additionally, the hospice is required to establish a written plan for providing hospice care by the patient's attending physician and the hospice medical director and interdisciplinary group, who must also periodically review the plan. 42 U.S.C. § 1395f(a)(7)(B) and (C); Medicare Manual, chpt. 9, § 40. The plan of care must be established before hospice care is provided. *Id.* Further, the services provided must be consistent with the plan of care. *Id.*

**B.    Intrepid Improperly Incentivized and Pressured Staff to Increase Enrollment.**

23.     Intrepid's senior management created a culture of placing profits before its patients and compliance with Medicare laws and policies. This was accomplished through pressuring staff and providing incentives to increase enrollment, resulting in patients being

admitted to hospice who were not terminally ill and who did not have the required certifications
and documentation to make them eligible for Medicare reimbursement.

24.     To increase enrollment, Intrepid instituted a bonus program that rewarded sales,
administration, and clinical staff based on admissions, retention, and the length of stay of the
hospice patients.  These programs were instituted by senior managers, including Chief Operating
Office ("CEO") John Kunysz and Robert Parker, who served dual roles as Chief Compliance
Officer ("CCO") and Vice President of Clinical Excellence and Integrity.  Persons who were
eligible for and received bonuses included sales representatives (called "patient advocates"), the
business office managers, and the regional clinical supervisors, who were registered nurses
responsible for overseeing admissions, certifications, and recertifications in the regional offices.

25.     The bonus program incentives employees not only for admitting patients, but for
admitting patients that have diseases that are more likely to be chronic (e.g., dementia) than
terminal (e.g., stage four cancer).  For example, according to Intrepid's bonus calculator, the
patient advocates were and are eligible to receive up to $2,500 per month for recruiting and
referring patients to Intrepid who were successfully admitted to hospice.  Further, the patient
advocates were and are eligible to receive a Longer Length of Stay ("LLOS") bonus for those
patients that they recruited who were anticipated to have a length of stay spanning multiple
benefits periods.  According to the eligibility criteria for the LLOS bonus, the bonus "only
appl[ies] for the primary diagnoses of Dementia, Cardiology, Pulmonology and Neurology," all
of which are more likely to be chronic conditions than other primary diagnoses.

26.     Several Intrepid employees raised concerns to senior management about the
bonus program.  For example, in the summer of 2019, a regional director of operations told CCO
Parker that she thought it was improper to bonus any employees based on admissions, and that

she was particularly concerned about bonusing clinicians based on admissions, and bonusing on criteria such as length of stay and particular diagnoses.  CCO Parker ignored these concerns.

27.     To further increase enrollment, Intrepid set up clinical review teams that reviewed all decisions or recommendations by Intrepid's clinical case managers (all of whom are registered nurses) who declined to admit a referred patient or who decided that an admitted patient should be discharged because the patient was not terminally ill.  Overseeing these decisions were clinicians, including regional clinical supervisors, who were incentivized by Intrepid's bonus program to admit or retain patients.  Notably, the clinical review teams only reviewed patients who were declined or recommended to be discharged; they did not review decisions to admit or recertify a patient to ensure that the patient was truly terminally ill.

28.     Intrepid's senior management placed special emphasis on retaining patients once admitted.  For example, on August 10, 2019, CEO Kunysz sent a company-wide email, where he noted that the company "continue[s] to have a challenge with declining census in spite of near record admissions."  To address the problem, he notified the company that senior clinical managers "are going to be working on additional ways to support our reviews of clinical recertification and the appropriateness for homecare/hospice and medical need."

29.     It is against this backdrop that Intrepid engaged in several fraudulent practices that resulted in millions of dollars of false claims to be submitted to Medicare.  This included (1) submitting claims that Intrepid knew, through its internal auditing process, were missing required documentation, and (2) admitting, retaining, and seeking reimbursement for patients who were not terminally ill, and, in many cases, altering patient files to attempt justify these wrongful enrollments.

**C.**   **Intrepid's Senior Managers Concealed the Fact that Dozens of Patient Files Were Missing Necessary Documents and Thus Ineligible for Medicare Reimbursement.**

30.     Intrepid has an audit policy that requires that every patient file be audited after the initial admission and every subsequent recertification to ensure that the files contained all of the necessary documents, including the necessary election and certification documents that Medicare laws, regulations, and rules require as a condition of reimbursement. Audits were typically performed by clinicians, including Plaintiffs Jones and Joffe.

31.     In May 2019, dozens of files had outstanding exceptions for missing documentation, all of which were material and required by Medicare, such as missing, incomplete, and/or unsigned notices of election, missing certifications from attending physicians for initial admissions, missing written plans of care, and missing face to face evaluations. These exceptions had been outstanding for months, some by more than six months, and were unable to be cured. As described in paragraphs 15-22, *supra,* the fact that these documents were missing made services provided to that patient ineligible for reimbursement from Medicare. All of the patients with the audit exceptions were receiving hospice benefits under Medicare.

32.     The exceptions were discussed in a meeting in early May 2019 that included Plaintiff Joffe and CCO Parker. At this meeting, Plaintiff Joffe raised her concern that there were numerous outstanding audit issues that the company was unable to resolve and, given the nature of the deficiencies, would not be able to resolve. Indeed, many, such as lack of documentation of a verbal certification from an attending physician within two days after admission, were not curable. Plaintiff Joffe said that the proper step would be to administratively discharge these patients and attempt to readmit them with the proper election, certification, and other requirements. An administrative discharge would mean that Intrepid

would not be able to bill Medicare for the services it provided during the period with missing documentation, and would have to refund Medicare for any money paid during that period.

33.    In response, Parker announced that he would be personally taking over the audits and that the others did not need to worry about them anymore.  This was an extraordinary action by Parker.  As the head of compliance, it was not Parker's job to involve himself in the audit of individual files.  He had never before conducted individual audits for Intrepid, and was not proficient with Intrepid's auditing management system.

34.    Shortly following this meeting, Plaintiff Joffe searched the system for the incomplete audits, and she discovered that nearly 80 audits had disappeared from the incomplete audit list.  She asked others on her team what happened, and was told that Parker had taken over the audits.

35.    Audit reports obtained by Plaintiff Jones reveal that on a single day—May 8, 2019—Parker changed the system with respect to over 50 audits, changing the outstanding audits that were marked as incomplete to complete.  The action of marking these audits as complete meant that, according to Intrepid's system, the file was deemed to have all of the proper documentation.  Notably, the audits that Parker marked as complete were all initial certification audits, which are for the benefit period with the highest Medicare reimbursement.

36.    Parker marked the audits as complete despite not curing the exceptions.  He did not obtain the missing documents, nor could he.  Several experienced auditors at Intrepid had been working on resolving the exceptions for several months, and had been unable to resolve them.  Parker, however, closed all of these issues out in a single day.

37.    Indeed, in some instances, Parker changed the file to eliminate the need to obtain a particular document.  For example, if the file had a missing certification from the patient's

11

attending physician, Intrepid's audit system would not allow the audit to be completed without obtaining that verification.  In such cases, Parker falsely marked that the certification was received, or changed the file to indicate that there was no attending physician, when in fact there was.

38.    Below is a summary of some of the files that Parker fraudulently cleared.  All of these patients were Medicare patients and Intrepid was improperly reimbursed by Medicare for its hospice services it provided to these patients:

| Patient Initials | Unresolved Exceptions Improperly Cleared by CCO Parker | Medicare Statutes, Regulations, and Policies Violated |
|---|---|---|
| B.M. | • Incomplete or missing election of benefits form | • 42 C.F.R. § 418.24(b); Medicare Manual, chpt. 9, § 20.2.1 (election of benefits) |
| | • No verbal or written certification from attending physician within 2 days of start of care | • 42 C.F.R. § 418.22(a)(3)(i); Medicare Manual, chpt. 9, § 20.1 (certification) |
| | • No verbal or written certification from hospice Medical Director within 2 days from start of care | • 42 U.S.C. § 1395f(a)(7)(D); 42 C.F.R. § 418.22(b); Medicare Manual, chpt. 9, § 20.1 (face to face) |
| | • No face to face evaluation | |
| P.M. | • No verbal or written certification from attending physician within 2 days of start of care | • 42 C.F.R. § 418.22(a)(3)(i); Medicare Manual, chpt. 9, § 20.1 (certification) |
| | • Missing adequate supporting documents justifying certification of terminal illness, including the required narrative | • 42 U.S.C. § 1395f(a)(7)(B) and (C); Medicare Manual, chpt. 9, § 40 (initial plan of care) |
| | • No initial plan of care | |
| R.S. | • No verbal or written certification from attending physician within 2 days after start of care | • 42 C.F.R. § 418.22(a)(3)(i); Medicare Manual, chpt. 9, § 20.1 (certification) |

| Patient Initials | Unresolved Exceptions Improperly Cleared by CCO Parker | Medicare Statutes, Regulations, and Policies Violated |
|---|---|---|
| W.H. | • No verbal or written certification from attending physician within 2 days after start of care | • 42 C.F.R. § 418.22(a)(3)(i); Medicare Manual, chpt. 9, § 20.1 (certification) |
| M.S. | • No verbal or written certification from attending physician within 2 days after start of care | • 42 C.F.R. § 418.22(a)(3)(i); Medicare Manual, chpt. 9, § 20.1 (certification) |
| F.B. | • No initial plan of care | • 42 U.S.C. § 1395f(a)(7)(B) and (C); Medicare Manual, chpt. 9, § 40 (initial plan of care) |
| D.G. | • Patient did not sign election of benefits<br><br>• No initial plan of care | • 42 C.F.R. § 418.24(b); Medicare Manual, chpt. 9, § 20.2.1 (election of benefits)<br><br>• 42 U.S.C. § 1395f(a)(7)(B) and (C); Medicare Manual, chpt. 9, § 40 (initial plan of care) |
| W.J. | • Initial plan of care not started on same day as start of care | • 42 U.S.C. § 1395f(a)(7)(B) and (C); Medicare Manual, chpt. 9, § 40 (initial plan of care) |
| C.B. | • Initial plan of care not started on same day as start of care | • 42 U.S.C. § 1395f(a)(7)(B) and (C); Medicare Manual, chpt. 9, § 40 (initial plan of care) |
| M.K. | • Patient did not sign election of benefits<br><br>• No verbal or written certification from attending physician within 2 days after start of care | • 42 C.F.R. § 418.24(b); Medicare Manual, chpt. 9, § 20.2.1 (election of benefits)<br><br>• 42 C.F.R. § 418.22(a)(3)(i); Medicare Manual, chpt. 9, § 20.1 (certification) |

| Patient Initials | Unresolved Exceptions Improperly Cleared by CCO Parker | Medicare Statutes, Regulations, and Policies Violated |
|---|---|---|
| R.M. | • No initial plan of care | • 42 U.S.C. § 1395f(a)(7)(B) and (C); Medicare Manual, chpt. 9, § 40 (initial plan of care) |
| E.J. | • Initial plan of care did not start on same day as start of care | • 42 U.S.C. § 1395f(a)(7)(B) and (C); Medicare Manual, chpt. 9, § 40 (initial plan of care) |
| B.C. | • Missing adequate supporting documents justifying certification of terminal illness, including the required narrative<br><br>• No certification by attending physician within two days after start of care | • 42 C.F.R. § 418.22(a)(3)(i); Medicare Manual, chpt. 9, § 20.1 (certification) |
| E.S. | • Missing adequate supporting documents justifying certification of terminal illness, including the required narrative<br><br>• No certification by attending physician within two days after start of care | • 42 C.F.R. § 418.22(a)(3)(i); Medicare Manual, chpt. 9, § 20.1 (certification) |
| M.R. | • Initial certification lacks sufficient support of terminal illness | • 42 C.F.R. § 418.22(a)(3)(i); Medicare Manual, chpt. 9, § 20.1 (certification) |
| B.H. | • Initial certification lacks sufficient support of terminal illness | • 42 C.F.R. § 418.22(a)(3)(i); Medicare Manual, chpt. 9, § 20.1 (certification) |
| B.G. | • Missing adequate supporting documents justifying certification of terminal illness, including the required narrative | • 42 C.F.R. § 418.22(a)(3)(i); Medicare Manual, chpt. 9, § 20.1 (certification) |
| C.Y. | • No certification by attending physician within two days after start of care | • 42 C.F.R. § 418.22(a)(3)(i); Medicare Manual, chpt. 9, § 20.1 (certification) |
| A.B. | • No certification by attending physician within two days after start of care | • 42 C.F.R. § 418.22(a)(3)(i); Medicare Manual, chpt. 9, § 20.1 (certification) |

| Patient Initials | Unresolved Exceptions Improperly Cleared by CCO Parker | Medicare Statutes, Regulations, and Policies Violated |
|---|---|---|
| J.G. | • No certification by attending physician within two days after start of care | • 42 C.F.R. § 418.22(a)(3)(i); Medicare Manual, chpt. 9, § 20.1 (certification) |
| J.E. | • No certification by attending physician within two days after start of care | • 42 C.F.R. § 418.22(a)(3)(i); Medicare Manual, chpt. 9, § 20.1 (certification) |
| M.S. | • No certification by attending physician within two days after start of care | • 42 C.F.R. § 418.22(a)(3)(i); Medicare Manual, chpt. 9, § 20.1 (certification) |

39.    To further conceal the lack of documentation, Intrepid managers would add backdated documents to the patients' files.  For example, during her audits in June of 2019 at the Roseville, Minnesota facility, an Intrepid clinical supervisor closely watched Plaintiff Jones over her shoulder as she was reviewing files.  When Plaintiff Jones would note a document missing from a file, the clinical supervisor would interject and deny the record was missing.  In one instance, Plaintiff Jones noted that a particular patient did not have the required election of benefits form despite being in hospice for over a year.  The clinical supervisor told her she would get the document signed.  Later that day, the election of benefits form was uploaded into the file, purportedly dated prior to the patient's admission, which was over one year earlier.  The clinical supervisor had fraudulently procured a backdated document to attempt to conceal the patient's ineligibility for hospice care.

**D.    Intrepid Knowingly Admitted and Retained Patients Who Were Not Terminally Ill and Created False Records to Conceal the Fraud.**

40.    As described, *supra*, Intrepid's senior management emphasized increasing and retaining the hospice enrollment over what was in the best interest of the patients.  This resulted in many patients being admitted and retained in hospice care who were not terminally ill.

41.     The improper admissions and retentions are evidenced by, among other things, Intrepid's own enrollment data, which reveals that the length of patient stays at Intrepid eclipsed national averages.  For example, according to data from the National Hospice and Palliative Care Organization (NHPCO), in 2017 the average length of service for all Medicare patients enrolled in hospice was 76.1 days (which number has remained steady within four days since 2012).  This is less than one Medicare benefit period.  In contrast, a patient roster for Intrepid's site in Roseville, Minnesota obtained by Plaintiff Jones shows that as of August 2019 the average length of stay for Intrepid's 353 hospice patients exceeded 240 days, which is three benefit periods.

42.     Further, according to the NHPCO data, in 2017, 86 percent of hospice patients enrolled in Medicare had a length of stay of 180 days (six months) or less, with only 14 percent exceeding 180 days.  This is what one would expect given that hospice is, by statutory definition, only available to those with a life expectancy of six months or less.  In contrast, the patient roster at Intrepid reveals that only 58 percent of the patients had a length of stay of 180 days or less, with 42 percent exceeding 180 days.  Thus, at Intrepid, the percentage of hospice patients exceeding a length of stay of 180 days was three times greater than the national average.

43.     In fact, the roster reveals that 63 of Intrepid's 353 hospice patients (18 percent) had a length of stay of over one year, 27 patients (six percent) had a length of stay over 2 years, and five (two percent) had a length of stay over 3 years.

16

44.    The following tables summarize the above described data:

| | National Data | Intrepid |
|---|---|---|
| *Average Patient Length of Stay (LOS)* | 76 days | < 240 days |
| *Patient LOS exceeding 180 days* | 14% | 42% |

| | |
|---|---|
| *Intrepid Patients with LOS > 1 year* | 63 of 353 (18%) |
| *Intrepid Patients with LOS > 2 years* | 27 of 353 (6%) |
| *Intrepid Patients with LOS > 3 years* | 5 of 353 (2%) |

45.    Plaintiffs both witnessed and reported these trends to senior management, but were ignored. For example, in May 2019, Plaintiff Joffe had a meeting with Intrepid's senior management, including CCO Parker, in which she and others raised the concern about the number of patients being recertified for hospice. She stated that there were an alarming number of patients that were being recertified for multiple benefit periods who did not appear to be terminally ill, but instead had become chronic. Parker told her and the group that they should recertify all of these patients anyway, and that if Medicare issued any additional development requests ("ADRs") to support the claims he would personally handle them.

46.    Further, during her audits and evaluations in Roseville, Minnesota between June 17 and 26, 2019, Plaintiff Jones observed multiple patients, all of whom were Medicare patients, who were admitted or recertified to hospice who were not terminally ill. Upon evaluation, many of the patients observed were far healthier than what was documented. She evaluated many of these patients with the clinical case manager for the patient, who, in many cases admitted that the patient appeared to be healthy enough to be discharged from hospice. But during subsequent

meetings with the interdisciplinary team, she witnessed the case manager reporting to the site's medical director that these very patients were in declining health and remained eligible for hospice. The medical director relied on these verbal and false reports in recertifying these patients. The patients who the clinical case manager made false statements about, included patients R.A., C.G. A.G., H.V., D.J., R.H., X.D., J.P., R.F., H.S., D.M., V.G., B.S., M.H., K.D., A.L., F.G., and A.F., all of whom were Medicare patients.

47. Further, many of these and other patient files had irregularities, including evaluations that were internally inconsistent, and, in several cases, evaluations that were deleted by the case manager, or entered well prior to the case manager's purported visit with the patient.

48. The following are some examples of patients that were improperly enrolled in hospice, and the efforts that Intrepid employees took to conceal the improper enrollment. Intrepid improperly received Medicare reimbursements for all of these patients.

Patient P.S.

49. Patient P.S. patient was admitted to hospice on March 28, 2016 with a diagnoses of stage IV breast cancer. In January 2018, Plaintiff Jones reviewed the patient's file and found no breast cancer diagnoses and found the patient was otherwise not terminally ill and thus ineligible for hospice. Plaintiff Jones reported this information to the clinical supervisor, and the patient was discharged. Intrepid, however, did not notify Medicare of the false diagnoses and the fact that Medicare had reimbursed Intrepid for a patient that was ineligible for Hospice.

50. Then, in November 2018, Intrepid readmitted the patient to hospice. This readmission was improper for several reasons. First, the patient was readmitted with the terminal diagnoses of "senile degeneration of the brain." But According to Intrepid's own policies, for a patient to be admitted based upon a diagnoses of senile degeneration of the brain, the patient had

to have a Functional Assessment Staging ("FAST") score of 7A or greater.  Patient P.S., however, had a FAST score of 6B, which was 4 tiers lower than 7A.  Notably, the FAST score of 6B was an *improvement* of the patient's score taken a year early during her prior admission and subsequent discharge, which was 6C.

51.     Second, the clinical case manager reported false information to attempt to establish that the patient's health was rapidly declining.  For example, in recommending the patient for hospice, the clinical case manager emphasized in the November 2018 admission assessment that the patient had lost 15 pounds in the year since November 2017, decreasing from 118 pounds to 103.  This, however, was false.  According to the patient's November 2017 records, the patient's weight at that time was 110 pounds, meaning the patient had lost only seven pounds.

52.     Third, rather than degrading, the medical records indicated that many aspects of the patient's health had improved or remained the same since she was discharged.  For example, a comparison of the patient's November 2017 and November 2018 records shows that the patient's condition improved or remained stable in several material respects, including (1) an increase in of 2.5 cm of the patient's bicep, which is often used to measure nutritional status, (2) an improvement in the patient's FAST score, (3) improvement in appetite and swallowing, and (4) no change in the amount of dependence for daily activities such as showers, dressing, toileting, ambulation, and feeding.

53.     In February of 2019, the patient was recertified for hospice.  In auditing the patient's file, Plaintiff Jones noticed more irregularities.  First, the patient's terminal diagnoses was changed from her original diagnoses of "senile degeneration of the brain," to "unspecified severe protein-calorie malnutrition."  This change of terminal diagnoses without discharging and

readmitting the patient was inappropriate, and done in an attempt to cover up the fact that patient, by Intrepid's own internal policies, was ineligible for admission based on an original terminal diagnoses of senile degeneration of the brain with a FAST score of less than 7A.

54.     Second, Plaintiff Jones discovered that the clinical case manager had deleted from the system several assessments of the patient based on face to face visits, including a recertification assessment. The clinical case manager then replaced the recertification assessment with another assessment that she wrote based on a purported visit that occurred several days after the deleted recertification assessment.

55.     Deleting entries and narratives describing patient visits is completely outside of protocol at Intrepid, and, in itself, highly suggests that the case manager was manipulating documents. This is confirmed by a comparison between the original and replacement certification assessments, which shows that the case manager changed several aspects of the patient's health to create a picture that the patient was in poorer health than she really was. These material changes included (1) increasing the amount of dependence on another person for showers, dressing, bathing, toileting, ambulation, and feeding, which suggests the patient had a decline in physical functional ability, (2) changing the patient from being alert to lethargic, (3) changing grip strength from strong to weak, and (4) changing the frequency of the patient's reported chest pains from "occasionally" to "more often this week."

Patient R.H.

56.     Patient R.H. was admitted on or around March 8, 2019 based on a terminal diagnoses of colon cancer. The patient, however, had no medical records supporting a cancer diagnoses. To attempt to justify keeping the patient on hospice, on June 6, 2019, the hospice

changed her terminal diagnoses to "protein calorie malnutrition," which terminal diagnoses was not supported by the patient's clinical symptoms.

Patient M.H.

57.     Patient M.H. was admitted to hospice in early 2016 with a terminal diagnoses of chronic congestive heart failure.  At the time that Plaintiff Jones audited her file in June 2019, she had been in hospice for over two years.  A careful review of her records reflected that the patient was chronic and not terminally ill.  Her records, however, had multiple irregularities evidencing that they had been manipulated to attempt to support keeping the patient on hospice.

58.     First, the face to face assessments of this patient were identical or nearly identical (with just two or three words changed) over time, indicating that the clinical managers were simply cutting and pasting their evaluations based on previous assessments.  These cut-and-paste assessments, when read together, presented irreconcilable descriptions of the patient's health. For example, in the patient's most recent recertification as of the time of the audit, the records indicated that her Palliative Performance Scale (PPS)—an 11-point scale designed to measure a patient's performance status in 10 percent decrements from 100 percent (healthy) to 0 percent (death)—had reduced from 40 percent to 30 percent.  But the recertification immediately prior to that time indicated the exact same decline of 40 percent to 30 percent, which is not possible.

59.     Further, the work log for this patient indicated that the clinical case manager deleted the assessments for multiple visits, which, as stated above, is highly irregular and outside the norms of Intrepid's record keeping protocol.  And with respect to a recertification completed in December 2018, the work log indicates that the clinical case manager opened and saved notes and assessments related to a face-to-face visit two weeks before the visit occurred, making periodic updates to the notes and assessments for several weeks thereafter.

Patient A.F.

60.     Patient A.F. was admitted to hospice on November 30, 2018.  In June 2019, Plaintiff Jones audited the file and discovered that the required face-to-face visit preceding the patient's third benefit period had not been performed, thus making the patient ineligible for reimbursement from Medicare.  Plaintiff Jones notified a clinical supervisor of the deficiency, but the clinical supervisor summarily dismissed her concern.

61.     Then, in July 2019, Plaintiff Jones discovered that a clinical case manager had falsified an entire patient assessment.  The clinical manager documented a face-to-face visit in the patient's home from 4:30 to 5:45 p.m. on July 5, 2019.  But the work log indicates that this entry was made at 10:44 a.m. that day, nearly seven hours prior to the purported visit.  Further, other records show that at the time of the purported visit, the patient was not at home, but in the hospital.  Thus, based on the records, the purported in-home visit, which was charged to and reimbursed by Medicare, could not have actually occurred and was entirely fabricated.

Other Patients

62.     After learning of the false and deleted case visits described above, Plaintiff Jones investigated the medical records of multiple patients who were evaluated by the offending clinical case manager.  She observed that the case manager routinely deleted entries and assessments of patient visits, which, again, is highly irregular and highly suggestive of document manipulation.  These included patients H.S., whose recertification prior to her 10th benefit period was deleted; patient D.K., who had several visits deleted from his file; patient V.G. who also had several visits deleted; and patient A.L. who also had several visits deleted.

**E.**     **Plaintiff Jones Reported the Fraudulent Conduct and Was Fired.**

63.     Plaintiff Jones became increasingly concerned about the number of patients enrolled who were not terminally ill, and the lack of supporting and required documentation necessary to justify hospice stay for many of the patients.  Plaintiff Jones began reporting these concerns to her superiors both verbally and over email.

64.     In response to her reported concerns, Plaintiff Jones' supervisor told her not to discuss any concerns about patient eligibility over email because that information was "discoverable" by the government.  She then referenced a company-wide email by CCO Parker that admonished all staff against sending "sensitive information" via email, which her supervisor explained included anything related to patient eligibility.  When Plaintiff Jones asked how she should send sensitive information in the future, her supervisor responded that she should handwrite her concerns on paper and fax them so as not to create an electronic record.  Her supervisor also told her that the company could not do a large discharge of patients, because a mass discharge would "send a red flag" to Medicare.

65.     Then, on August 29, 2019, after Plaintiff Jones discovered the false report of a patient visit that did not occur with respect to patient A.F (discussed in paragraph 61, *supra*), she emailed her findings and supporting evidence to her superiors.  In her email, she stated unequivocally that she believed that the clinical case manager falsified a visit report for a visit that did not occur.

66.     Four days later, on September 3, 2019, Plaintiff Jones was abruptly terminated. The purported reason for her termination was that the company was eliminating her position due to budget concerns.

67.    The stated reason for Plaintiff Jones's termination was a sham.  Plaintiff Jones was not terminated because the company had decided to eliminate her position, but in retaliation for reporting and objecting to the improper conduct that she observed to her superiors.  Indeed, two days after Plaintiff Jones's position was "eliminated," Intrepid posted a job opening on its website for a position that was identical in job description to Plaintiff Jones's position to fill the vacancy left by her departure.

68.    In addition to terminating Plaintiff Jones, Intrepid has terminated or forced many other management-level employees out who complained about or resisted Intrepid's improper practices of, among other things, admitting and/or retaining patients who are not terminally ill; bonusing employees, including clinicians, based on admissions, terminal disease diagnoses, and anticipated length of stay; and failing to maintain proper and required documentation for its patients.  Intrepid has replaced these management-level people with non-clinical and/or less experienced employees.  Intrepid has done so because these less experienced and less qualified employees do not have the knowledge or experience to recognize many of Intrepid's improper practices, and thus are far more likely to follow the orders of Intrepid's senior management without objection.

69.    The terminated employees include: (1) the director of clinical services at Intrepid's Richmond, Virginia site, an experienced hospice nurse who was told that her position was eliminated, but was replaced the day after her departure with an employee with no hospice experience; (2) an administrator in the Charleston, South Carolina, who was also told her position was eliminated, but immediately replaced with an employee with no hospice experience; and (3) a QAPI and business development director, who was also told her position was

24

eliminated after six years of service, only to have it immediately filled by an Intrepid employee who was still in training and had no hospice experience.

**F.    Medicare Laws, Regulations, and Policies that Intrepid Violated.**

70.    As described above, Intrepid billed Medicare and received reimbursement for services provided to patients who were not terminally ill or whose files did not contain the proper certifications and documentation required by Medicare laws and policies.  With respect to these patients, Intrepid thus violated, among other things, 42 U.S.C. § 1395f(a)(7), 42 C.F.R. §§ 418.22 and 418.24, and multiple provisions of the policies set forth in Medicare Manual, chpt. 9.

71.    Additionally, Intrepid's bonus program rewarding its staff based on admissions, terminal disease diagnoses, and anticipated and actual patient lengths of stay violates the Anti-Kickback Statute ("AKS").  The AKS forbids anyone from knowingly and willfully paying any renumeration, including kickbacks, bribes, or rebates, to any person to induce such person to refer an individual for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a federal health care program.  42 U.S.C. §1320a-7b(b)(2)(B).  Any claim that results from a violation of the AKS constitutes a false or fraudulent claim under the FCA.  42 U.S.C. § 1320a-7b(h).

72.    Intrepid's bonus program constitutes a renumeration to induce staff to refer for admission, admit, and retain hospice patients.  The program was specially designed to increase renumeration for those referrals and admissions that were based on illnesses that were more likely to be chronic than terminal, resulting in longer lengths of stay.  This bonus program violated the AKS, and, as a result, all claims submitted to Medicare for patients procured or retained pursuant to this illegal bonus program are false claims in violation of the FCA.

G.    **Intrepid's False Claims to the United States.**

73.    As discussed above, Intrepid's illegal practices affected government healthcare programs, primarily Medicare.  With each claim submitted, Intrepid made or caused others to make several false statements and certifications, both express and implied, to Medicare.

74.    The relevant certifications that Intrepid and its providers made include the following.  When enrolling to participate in the Medicare Program, Intrepid's providers themselves submitted Form CMS-855I.  When the providers signed and submitted Form CMS-855I, they attested as follows:

***

(3) I agree to abide by the Medicare laws, regulations and program instructions....

I understand that payment of a claim by Medicare is conditioned upon the claim

and the underlying transaction complying with such laws, regulations, and

program instructions (including, but not limited to, the federal anti-kickback

statute and the Stark law), and on the supplier's compliance with all applicable

conditions of participation in Medicare.

***

(6) I will not knowingly present or cause to be presented a false or fraudulent

claim for payment by Medicare, and I will not submit claims with deliberate

ignorance or reckless disregard of their truth or falsity.

*See* Form CMS-855I.

75.    Because the Intrepid providers operated in a practice group or organizational setting, they were required to, and did, complete Form CMS-855R, which reassigned the benefits to Intrepid who billed for the wound care specialists' services.  In turn, Intrepid was required to,

and did, complete Form CMS-855B to be eligible to participate in the Medicare Program. In so

doing, Intrepid signed the "Certification Section" in Section 15, which "legally and financially

binds [the] supplier to all of the laws, regulations and program instructions of the Medicare

Program," and contains the same certification language as Form CMS-855I described above:

***

> (3) I agree to abide by the Medicare laws, regulations and program
>
> instructions.... I understand that payment of a claim by Medicare is
>
> conditioned upon the claim and the underlying transaction complying with
>
> such laws, regulations, and program instructions (including, but not limited to,
>
> the federal anti-kickback statute and the Stark law), and on the supplier's
>
> compliance with all applicable conditions of participation in Medicare.

***

> (6) I will not knowingly present or cause to be presented a false or fraudulent
>
> claim for payment by Medicare, and I will not submit claims with deliberate
>
> ignorance or reckless disregard of their truth or falsity.

*See* Form CMS-855B.

76.    Further, with each claim submitted to Medicare, Intrepid and its providers were

required to, and did, complete and submit Form CMS-1500, the health insurance claim form,

where they documented, among other things, the CPT codes for the services provided, and

certified as follows:

> • "[T]his claim, whether submitted by me or on my behalf by my designated
>
>    billing company, complies with all applicable Medicare and/or Medicaid
>
>    laws, regulations, and program instructions for payment including but not

27

limited to the Federal anti-kickback statute and Physician Self-Referral

law (commonly known as the Stark statute)";

- "The services on this form were medically necessary and personally

  furnished incident to my professional…"; and

- "I certify that the services listed above were medically indicated and

  necessary to the health of this patient…."

*See* Form CMS-1500.

77. Thus, for each claim for reimbursement that Intrepid made for patients whose files were missing required documentation, who were not terminally ill, who had received services that were medically unnecessary or not actually provided, and/or who had been procured in violation of the AKS, Intrepid both expressly and implicitly, made or caused its providers to make the above certifications, all of which were false.

## CLAIMS FOR RELIEF

### Count 1—Violation of the False Claims Act

78. Plaintiffs/Relators reallege and incorporate by reference the prior paragraphs as if fully set forth herein.

79. Based on the acts described above, in violation of 31 U.S.C. § 3729(a) of the FCA, Intrepid (1) knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval, (2) knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States, and (3) knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.

80. The false and fraudulent claims and statements that Intrepid made or caused others to make were material, as they had a natural tendency to influence, or be capable of

influencing, the payment or receipt of money or property. Indeed, had the federal healthcare programs been aware of the false and fraudulent nature of the claims, statements, and omissions, the claims would not have been paid.

81.     By reason of these false or fraudulent claims or statements, the United States has been damaged in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**Count 2—Wrongful Termination in Violation of the**
**False Claims Act, 31 U.S.C. 3730(h)**

82.     Plaintiff Jones realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

83.     The FCA forbids employers from discharging, demoting, suspending, threatening, harassing, or otherwise discriminating against an employee for an employee's lawful action done in furtherance of an FCA claim or for any other efforts to stop the employee from committing one or more FCA violations. 31 U.S.C. § 3730(h)(1).

84.     Intrepid violated this section by harassing, discharging, threatening, demoting, and discriminating against Plaintiff Jones for complaining of and refusing to engage in the wrongful practices described above.

85.     As a result, Plaintiff Jones has suffered substantial damages, and is entitled to all remedies available at law and equity, including those listed in 31 U.S.C. § 3730(h)(2).

**Count 4—Common Law Wrongful Termination**

86.     Plaintiff Jones realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

87.     There is a clear public policy against firing employees for refusing to commit an illegal act or in retaliation for reporting employer misconduct, i.e., whistleblowing.

29

Discouraging employees from refraining from illegal activity or from whistleblowing jeopardizes these public policies.

88.     Intrepid wrongfully retaliated against and terminated Plaintiff Jones for refusing to participate in the illegal conduct described herein and for reporting it to her superiors.

89.     There was no overriding justification for Intrepid's retaliation and wrongful discharge of Plaintiff Jones.

90.     As a result of this retaliation and wrongful termination, Plaintiff Jones has suffered substantial injury and is entitled to all available remedies at law or equity.

91.     Intrepid's conduct was malicious, willful, wanton, and done in reckless disregard of Plaintiff's rights, and thus she is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered against Defendant Intrepid as follows:

(1) Treble the United States' damages in an amount to be determined at trial, plus the maximum statutorily-allowed penalty for each false claim submitted in violation of the FCA;

(2) Plaintiff Jones's damages under the FCA and applicable common law that she sustained as a result of Intrepid's retaliation and wrongful termination;

(3) Punitive damages for Intrepid's malicious, willful, wanton, and reckless conduct in retaliating against and wrongfully terminating Plaintiff Jones;

(4) Plaintiffs' reasonable attorneys' fees and costs;

(5) The maximum relator award available under the FCA; and

(6) For any further relief the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial for all claims so triable.

Dated:  November 25, 2019

Respectfully Submitted,

LARSON KING, LLP

By: _____

Patrick H. O'Neill, Jr. (#0207950)
30 East Seventh Street, Suite 2800
Saint Paul, Minnesota 55101
P: 877-373-5501
F: 651-312-6618
poneill@larsonking.com

ELIAS LLC
Richard M. Elias (Pro Hac Vice to Be Filed)
130 S. Bemiston Ave, Sutie 302
St. Louis, MO 63105
P: 314-391-6820
relias@eliasllc.com

*Attorneys for Plaintiffs/Relators*